CHAMBER OF COMMERCE OF the UNITED STATES, et al., Appellants,

v.

Robert B. REICH, Secretary, United States Department of Labor, Appellee.

No. 95–5242.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 15, 1995.

Decided Feb. 2, 1996.

Timothy B. Dyk argued the cause, for appellants, with whom Andrew M. Kramer, Willis J. Goldsmith, and Daniel H. Bromberg, Washington, DC, were on the briefs.

Stephen W. Preston, Attorney, United States Department of Justice, Washington, DC, argued the cause, for appellee. On the brief were Frank W. Hunger, Assistant Attorney General, and Mark B. Stern, Attorney, Eric H. Holder, Jr., United States Attorney, Allen Feldman, Steven J. Mandel, and Edward D. Sieger, Attorneys, Washington, DC, United States Department of Labor.

Martin S. Kaufman was on the brief, for amici curiae Paul Coverdell and Slade Gorton.

Maurice Baskin, Washington, DC, Michael E. Avakian, North Springfield, VA, Peter A. Susser, Washington, DC, and Douglas Darch,

Chicago, IL, were on the brief, for amici curiae Associated Builders and Contractors, Inc., Manufacturers Alliance International Mass Retail Association, Center on National Labor Policy, Inc., American Bakers Association, National–American Wholesale Grocers' Association/International, Driver Employer Council of America, Society for Human Resource Management, Illinois Chamber of Commerce, and Wisconsin Manufacturers and Commerce.

Anthony B. Byergo, Chicago, IL, entered an appearance, for amici curiae Illinois Chamber of Commerce and Wisconsin Manufacturers and Commerce.

Before: SILBERMAN, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellants challenge President Clinton's Executive Order barring the federal government from contracting with employers who hire permanent replacements during a lawful strike. The district court determined that appellants' challenge is not judicially reviewable and, in any event, the Order is legal. We conclude that judicial review is available and that the Order conflicts with the National Labor Relations Act, and therefore we reverse.

## I.

President Clinton issued Executive Order No. 12,954, 60 Fed.Reg. 13,023 (1995), on March 8, 1995, pursuant to his authority under the Federal Property and Administrative Services Act, 40 U.S.C. § 471 *et seq.* (the Procurement Act), which declares:

It is the policy of the executive branch in procuring goods and services that, to ensure the economical and efficient administration and completion of Federal Government contracts, contracting agencies shall not contract with employers that permanently replace lawfully striking employees.

Order at 13,023, § 1. The Order applies to all government contracts over $100,000. In 1994, federal procurement exceeded $400 bil-

lion and constituted approximately 6.5% of the gross domestic product. *See* STATISTICAL ABSTRACT OF THE UNITED STATES 451 (115th ed. 1995). As of 1993, approximately 26 million workers, 22% of the labor force, were employed by federal contractors and subcontractors. GENERAL ACCOUNTING OFFICE, REPORT TO SENATOR PAUL SIMON, WORKER PROTECTION: FEDERAL CONTRACTORS AND VIOLATIONS OF LABOR LAW (Oct. 1995) (GAO REPORT).

The Order explains that the "balance" between allowing businesses to operate during a strike and preserving worker rights is disrupted when an employer hires permanent replacements during a strike. "It has been found" that the hiring of permanent replacements results in longer strikes, can change a "limited dispute into a broader, more contentious struggle," and results in the loss to the employer of the "accumulated knowledge, experience, skill, and expertise" of the striking workers. These consequences adversely affect federal contractors' ability to supply high quality and reliable goods and services.

The Secretary of Labor is charged with implementing and enforcing the Order. If the Secretary finds that a contractor has permanently replaced lawfully striking workers, the Secretary "may make a finding that it is appropriate to terminate the contract for convenience" unless the head of the contracting agency objects. The Secretary is also to debar contractors that have permanently replaced striking workers from future government contracts unless the "labor dispute precipitating the permanent replacement of lawfully striking workers has been resolved, as determined by the Secretary" or the head of the agency determines that there is a compelling reason to lift the debarment. A debarment "normally will be limited to those organizational units of a Federal contractor that the Secretary finds to have permanently replaced lawfully striking workers."

On May 25, Secretary Reich issued final implementing regulations. *See Permanent Replacement of Lawfully Striking Employees by Federal Contractors,* 60 Fed.Reg. 27,-856 (1995). Organizational unit is defined as covering "(1) A division or other organiza-

tional element of a person that is responsible as the prime contractor for performing a contract, and (2) Any other affiliate of the person that could provide the goods or services required to be provided under the contract." The regulations also set forth the factors to be considered in determining whether a labor dispute resulting in debarment has been resolved: whether the parties to the dispute have reached a formal settlement or agreed upon a procedure for resolving their differences, whether the parties have agreed to an informal resolution of the dispute, whether the striking employees have returned to work, and any other factors "tending to lead to the conclusion that the labor dispute has ended."

Prior to the President's Executive Order, there were numerous legislative attempts to restrict the use of permanent replacements. In 1993 the Workplace Fairness Act was introduced in the Senate, see S. 55, 103d Cong., 1st Sess., which would have made the use of permanent replacements an unfair labor practice. Supporters similarly argued that the use of permanent replacements upsets the "balance" between labor and management and leads to lower productivity. See S.REP. No. 110, 103d Cong., 1st Sess. 20–25 (1993). It failed to pass.

Appellants, the Chamber of Commerce, American Trucking Associations, Inc., Labor Policy Association, National Association of Manufacturers, Bridgestone/Firestone, Inc., and Mosler Inc., filed suit on March 15, prior to the Secretary's promulgation of the regulations, seeking declaratory and injunctive relief against the Secretary of Labor's enforcement of the Executive Order. They alleged that the Order is contrary to the National Labor Relations Act, 29 U.S.C. § 151 et seq. (NLRA), the Procurement Act and the Constitution. On expedited appeal we reversed the district court's determination that appellants' claims were not ripe. See Chamber of Commerce v. Reich, 57 F.3d 1099 (D.C.Cir.1995). The district court, on remand, again ruled in favor of the government. It held that appellants' statutory claim that the Executive Order violated the

NLRA is not judicially reviewable since the Procurement Act vests broad discretionary authority in the President just as did the statute at issue in Dalton v. Specter, —— U.S. ——, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994), in which the Supreme Court refused to review a claim that the President had abused his statutory discretion. Appellants' constitutional claim similarly was held to be unreviewable as nothing more than an argument that the President abused his statutory powers. The district court, in the alternative, rejected appellants' statutory claim on the merits, reasoning that under the Executive Order the government was acting in a proprietary capacity and, therefore, NLRA preemption was inapplicable. The court stressed that the President's interpretation of the Procurement Act as authorizing the Order was entitled to Chevron-like deference and was reasonable because it furthered the statutory values of "economy" and "efficiency" (the government does not attempt to defend on appeal the court's deference to the President's interpretation). The court also noted that the government was merely exercising an option "available" to a private contractor.

## II.

Appellants challenge the Executive Order on three separate grounds: that the Order transgresses an employer's statutory right (under the NLRA) to hire permanent replacements to supplant "economic" strikers; [1] that the Order also violates the very Procurement Act which it purports to implement because the President neglected to make findings tying the Order to savings in government procurement costs; and that this lack of presidential findings independently violates the Constitution since it would render the Procurement Act an unconstitutional delegation under Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

■ Before dealing with appellants' substantive arguments, we must treat with the government's assertion that we lack authori-

---

**1.** "Unfair labor practice strikers" are not permanently replaceable. See NLRB v. International

Van Lines, 409 U.S. 48, 50–51, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972).

ty to review the President's Order. The government argues that appellants lack the necessary statutory cause of action and can point to no applicable waiver of sovereign immunity. A cause of action under § 702 of the APA is not available because this section applies only to a "person suffering legal wrong because of *agency* action," 5 U.S.C. § 702 (1977) (emphasis added). Here, the government argues, appellants' challenge is directed at the *President's* statutory authority to issue the Executive Order. In *Franklin v. Massachusetts,* 505 U.S. 788, 797, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992), the Supreme Court held that the "President is not an agency within the meaning of the [APA]." Similarly, the government contends that § 702's waiver of sovereign immunity "by [its] terms appl[ies] only to agency action." Given the nature of appellants' challenge, there does not exist the necessary "agency action" that triggers the APA's waiver of sovereign immunity.

Even were appellants to pass by cause of action and sovereign immunity barriers, the government, relying heavily on the Supreme Court's recent decision in *Dalton,* contends that the *President's* actions are not reviewable here because "longstanding authority holds that [judicial review of an alleged presidential violation of a statute] is not available when the statute in question commits the decision to the discretion of the President." *Dalton,* —— U.S. at ——, 114 S.Ct. at 1727. Since the Procurement Act grants the President such broad discretion, it is argued that appellants' case reduces only to a claim that the President abused his discretion—a claim which we are not authorized to entertain. The government acknowledges that whatever discretion to set procurement policy the President enjoys under the Procurement Act is limited by the Constitution, and therefore an independent claim of a President's violation of the Constitution would certainly be reviewable. Still, the government would have us brush aside appellants' *Panama Refining* argument because it is based on a long-disregarded alternative holding in that

case,[2] and therefore appellants should be thought to merely make the same abuse of discretion claim in constitutional dress.

The government's characterization of appellants' *Panama Refining* claim strikes us as a bit disingenuous, and we are puzzled that the district court never even mentioned the claim—either as to its jurisdictional significance or on its merits. Nevertheless, we very much doubt that the alternative holding of *Panama Refining* has a great deal of separate vitality today; even the basic doctrine of unconstitutional delegation, while by no means repudiated, *see Industrial Union Dep't, AFL–CIO v. American Petroleum Inst.,* 448 U.S. 607, 648, 100 S.Ct. 2844, 2867, 65 L.Ed.2d 1010 (1980) (plurality), remains only a shadowy limitation on congressional power. Since our subject matter jurisdiction must be determined claim by claim and appellants' more powerful arguments seem to be its statutory ones, we will first consider whether we have jurisdiction to review them.

Appellants could not possibly have relied on the APA for a cause of action prior to the Secretary's issuance of regulations implementing the Executive Order because, as the government correctly emphasizes, the President is not an "agency" under that Act and appellants sued before the Secretary issued his regulations. Nevertheless, in our prior opinion in this case, we recognized the legal significance of the regulations to appellants' cause of action. The government had initially argued (and the district court had agreed) that the Executive Order which appellants promptly attacked on issuance was not ripe, because the Secretary had not yet "fleshed out" the President's policy with regulations. We noted that this point was no longer relevant, since by the time the case was heard on appeal the regulations had been issued. *Chamber of Commerce,* 57 F.3d at 1100. Appellants have not, however, amended their complaint to rely on the APA—perhaps because they fear any relief short of a declaration that the Executive Order is illegal would be inadequate. The government, for its part,

---

2. The primary holding was that the statute constituted an unconstitutional delegation because it gave President Roosevelt unguided discretion to prevent the shipment in interstate commerce of oil produced in contravention of state law. Appellants do not claim that the Procurement Act is similarly an unconstitutional delegation of legislative authority.

claims that a cause of action under the APA is not available, even were appellants to rely on it, because a challenge to the regulation should be regarded as nothing more than a challenge to the legality of the President's Executive Order and therefore not reviewable. It would seem that the government's position is somewhat in tension with its previous claim that the Secretary's regulations were necessary to "flesh out" the Executive Order. And we doubt the validity of its unsupported interpretation of the APA; that the Secretary's regulations are based on the President's Executive Order hardly seems to insulate them from judicial review under the APA, even if the validity of the Order were thereby drawn into question. *See Public Citizen v. United States Trade Representative*, 5 F.3d 549, 552 (D.C.Cir.1993) ("*Franklin*['s denial of judicial review of presidential action] is limited to those cases in which the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action directly to affect the parties."), *cert. denied*, —— U.S. ——, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994) (emphasis added). Still, recognizing the anomalous situation in which we find ourselves—not able to base judicial review on what appears to us to be an available statutory cause of action—we go on to the issue of whether appellants are entitled to bring a non-statutory cause of action questioning the legality of the Executive Order.

■ If a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action. Byse and Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action*, 81 HARV.L.REV. 308, 321 (1967). Until the turn of the century, the availability of non-statutory review of executive action was uncertain. The Supreme Court from 1870 to 1900 "entertained considerable doubt, in the absence of statutory provision, as to the propriety of judicial control of 'executive' action." JAFFEE, JUDICIAL CONTROL OF ADMINISTRATIVE ACTION 337 (1965). Then came *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90 (1902). The

Postmaster General had barred the plaintiff from advertising, fraudulently in the Postmaster General's view, that he could cure disease by the "proper exercise of the faculty of the brain and mind." *Id.* at 96, 23 S.Ct. at 34. The plaintiff sought an injunction to restrain a subordinate official from carrying out the order of the Postmaster General. The Court, granting relief, explained that the:

> acts of all [a government department's] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief.... Otherwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual.

*Id.* at 108, 110, 23 S.Ct. at 38, 39. The reasoning of *McAnnulty* has been employed repeatedly. In *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), the Court considered a complaint seeking to enjoin the Secretary of Agriculture for allegedly exceeding his statutory authority. The statute in question did not provide judicial review for the complainant, but the Court observed that "[t]he responsibility of determining the limits of statutory grants of authority ... is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Id.* at 310, 64 S.Ct. at 571. And in *Harmon v. Brucker*, 355 U.S. 579, 581–82, 78 S.Ct. 433, 434–35, 2 L.Ed.2d 503 (1958), the Court, relying on *McAnnulty*, stated that "generally, judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." Perhaps the most dramatic example of the application of the general presumption of reviewability is *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). In that case, it was undisputed that the National Labor Relations Board flatly violated a statutory prohibition (putting professional employees into a bargaining group with non-professional employees). The plaintiff requested that the Board's bargaining unit certification be set

aside, despite an implied preclusion of judicial review of that issue—at least in that context. The Court framed the legal question as whether "the law, apart from the review provisions of the ... [NLRA], affords a remedy?" *Id.* at 188, 79 S.Ct. at 183 (quotation marks omitted). The Court answered, "We think the answer surely must be yes.... Plainly, this was an attempted exercise of power that had been specifically withheld. It deprived the professional employees of a 'right' assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given." *Id.* at 188, 189, 79 S.Ct. at 183, 184. The message of this line of cases is clear enough: courts will "ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 681, 106 S.Ct. 2133, 2141, 90 L.Ed.2d 623 (1986).

We have previously read *McAnnulty* as do appellants. In *Dart v. United States,* 848 F.2d 217, 224 (D.C.Cir.1988), we said that "[n]othing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review.... It does not repeal the review of *ultra vires* actions recognized long before, in *McAnnulty*.... When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority." To be sure, if Congress precluded non-statutory judicial review, a showing the government does not even attempt to make, that would be another matter. But we have never held that a lack of a statutory cause of action is *per se* a bar to judicial review. *See, e.g., Five Flags Pipe Line Co. v. Department of Transp.,* 854 F.2d 1438, 1439 (D.C.Cir.1988) ("If Congress makes no specific choice of [the court in which judicial review is to occur] in the statute pursuant to which the agency action is taken, or in another statute applicable to it, then an aggrieved person may get 'nonstatutory review' ... in federal district court pursuant to the general 'federal question' jurisdiction of that court.") (citation omitted); *AFL–CIO v. Kahn,* 618 F.2d 784, 787–93, 796 (D.C.Cir.) (en banc) (reviewing

Procurement Act and NLRA claims without explicitly considering the cause of action), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979); *National Ass'n of Postal Supervisors v. United States Postal Service,* 602 F.2d 420, 432 (D.C.Cir.1979) (non-statutory review of whether agency exceeded its delegated authority); *Jordan v. United Ins. Co.,* 289 F.2d 778, 782–83 (D.C.Cir.1961) (permitting non-statutory review by the district court of administrative action). That the "executive's" action here is essentially that of the President does not insulate the entire executive branch from judicial review. We think it is now well established that "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." *Franklin,* 505 U.S. at 815, 112 S.Ct. at 2790 (Scalia, J., concurring in part and concurring in the judgment). Even if the Secretary were acting at the behest of the President, this "does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands." *Soucie v. David,* 448 F.2d 1067, 1072 n. 12 (D.C.Cir.1971).

■■■ Nor does sovereign immunity appear to bar appellants' suit. Section 702 of the APA provides:

An action in a court of the United States seeking relief other than money damages and stating a claim that an *agency* or an officer or employee *thereof* acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphases added). The APA's waiver of sovereign immunity applies to any suit whether under the APA or not. *See, e.g., Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C.Cir.1984); *Sea–Land Serv., Inc. v. Alaska R.R.,* 659 F.2d 243, 244 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982); *see also* BATOR, MELTZER, MISHKIN, & SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM, 1154 (3d ed. 1988).

The government argues, in a slight variation of its argument challenging appellants' cause of action, that the APA's waiver of sovereign immunity does not apply since the "plaintiffs are challenging the President's statutory authority to issue the Executive Order, and not any action of the Secretary in implementing or interpreting the Order." The government believes it follows, under *Franklin*'s holding—that the President is not an "agency" for APA purposes—that § 702's waiver is not applicable in a case where the legality of the President's action is challenged. In *Franklin*, however, the Court first determined that the actions of the Secretary of Commerce in reporting census data to the President was not final agency action, and therefore not reviewable under the APA. With the Secretary out of the picture *only* the President's decision was called into question. The Court concluded that it could "only review the APA claims here if the President, not the Secretary of Commerce, is an 'agency' within the meaning of the Act." *Franklin*, 505 U.S. at 798, 112 S.Ct. at 2775. In this case, as we have noted, we have the reverse pattern. The President's Executive Order, which initiated this policy, was subsequently implemented by the Secretary's regulations. Although appellants do not rely on the Secretary's regulations to bring an APA cause of action, they do assert that the APA's waiver of sovereign immunity applies and in that respect the regulations appear relevant.

Be that as it may, under *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91, 69 S.Ct. 1457, 1461–62, 93 L.Ed. 1628 (1949), if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit. *See also Dugan v. Rank*, 372 U.S. 609, 621–22, 83 S.Ct. 999, 1006–07, 10 L.Ed.2d 15 (1963); *Malone v. Bowdoin*, 369 U.S. 643, 647, 82 S.Ct. 980, 983, 8 L.Ed.2d 168 (1962). Since "the [Secretary of Labor's] powers are [allegedly] limited by [the NLRA], his actions beyond those limitations [*viz.*, enforcing the Executive Order] are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do ..." *Larson*, 337 U.S. at 689, 69 S.Ct. at

1461. So, there is no sovereign immunity to waive—it never attached in the first place.

Although the government's brief advanced a breathtakingly broad claim of non-reviewability of presidential actions, the government does not seriously press its argument that we may not exercise jurisdiction over appellants' claim because they lack a cause of action or cannot point to a waiver of sovereign immunity. At oral argument counsel relied instead on the more limited notion, also advanced in the brief, that the Procurement Act delegated wide discretion to the President and we were not authorized to review his exercise of that discretion so long as he did not violate a direct prohibition of another statute (or the Constitution).

COUNSEL: I just wanted to make clear that our position is that it is possible that an Executive Order under the Procurement Act, that would violate either an expressed prohibition in the Procurement Act or another expressed prohibition in statute, could be reviewable. But our position—

THE COURT: Like, for example, a Procurement Act Executive Order that says that we shall only buy goods from companies whose average age of the work force is 40 years old, because we all know that younger workers are more efficient. Would that be reviewable?

COUNSEL: I believe that that most probably would. I think—

.    .    .    .    .

THE COURT: No, but would you concede that, if it violates the National Labor Relations Act, it's reviewable?

COUNSEL: If it were to violate a prohibition in the National Labor Relations Act, then I think you would have a reviewable claim. Our point is—

.    .    .    .    .

THE COURT: Are you saying you would have to find an express prohibition in the National Labor Relations Act to make it reviewable, as to whether or not he had violated that law, as opposed to an implicit protection such as preemption?

COUNSEL: I think for reviewability, yes, sir.

THE COURT: So if the National Labor Relations Act had specifically said that employers are entitled to permanently replace strikers in an economic strike, as opposed to an unfair labor practice strike, then this case would be reviewable?

COUNSEL: No, I would not agree with that, either, Your Honor, because—

THE COURT: I don't understand your position.

.    .    .    .    .

COUNSEL: ...

My point, Your Honor, is that we have two statutes that, *on their face*, do not conflict. . . .

Tr. of Oral Arg. at 39–42 (emphasis added).

From that dialogue, it appears that the government concedes that a cause of action would lie and sovereign immunity be waived if the President issued an Executive Order under the Procurement Act that violated or caused others to violate an express *prohibition* of that Act or another statute. We frankly do not understand how a distinction—in terms of reviewability—can be drawn between a claim that the President's Executive Order (and the Secretary's implementing regulations) transgresses or causes a contractor to violate a prohibition of another statute and one that deprives a contractor of a right expressly or impliedly granted by another statute. To be sure, in *Leedom v. Kyne*, the NLRB violated a specific statutory prohibition, but the case is also described as depriving the professional employees of a statutory right. *See* 358 U.S. at 187, 79 S.Ct. at 183. *Leedom* has come to stand for the proposition that "if an agency openly violates a clear mandate of a statute *even* [an implied] preclusion of judicial review . . . will not bar judicial intervention." *United States Dep't of Treasury v. FLRA*, 43 F.3d 682, 688 (D.C.Cir.1994) (emphasis added). Appellants are similarly alleging a palpable violation of the NLRA—the Executive Order's impingement on the long-recognized NLRA right to hire permanent replacements. Nor do we think it can possibly matter for purposes of reviewability whether the alleged statutory right or mandate is found in the statute in so many words or has been so interpreted by the Supreme Court as appellants claim in this case. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 111–12, 110 S.Ct. 444, 451, 107 L.Ed.2d 420 (1989).

■ As for the government's claim that given the discretion Congress has delegated to the President to administer the Procurement Act judicial review is precluded here, it is important carefully to distinguish between the government's argument on the merits and its non-reviewability claim.[3] Granted, the Procurement Act does vest broad discretion in the President. Its stated goal is "to provide for the Government an economical and efficient system for . . . procurement and supply. . . ." 40 U.S.C. § 471 (1986). Section 486(a) gives the President the authority to prescribe policies and directives "as he shall deem necessary to effectuate the provisions" of the Act. Indeed, in *Kahn*, we concluded that President Carter's Executive Order authorizing denial of government contracts to companies that fail or refuse to comply with "voluntary" wage and price standards was within the authority delegated by the Procurement Act since the Executive Order accorded with the values of "economy" and "efficiency." We reasoned that encouraging compliance with the wage and price standards would help control inflation and limit the ability of contractors with whom the government negotiates to increase prices thereby resulting in the government "[facing] lower costs in the future than it would have otherwise." *Kahn*, 618 F.2d at 793. But *Kahn* makes clear that the President, even under the Procurement Act, does not have unlimited authority to make decisions he believes will likely result in savings to the government. We cautioned that our decision did not "write a blank check for the President to fill in at his will. The procurement power *must* be exercised consistently with the structure and purposes of the statute

---

**3.** *Leedom v. Kyne* does seem to meld the two, almost reasoning from the proposition that if the government's actions were alleged to be palpably illegal there must be review, but it does not follow that there is *no* reviewability if we conclude that the President's action was authorized.

that delegates that power." *Id.* at 793 (emphasis added) (footnote omitted). Despite our expansive reasoning upholding President Carter's Executive Order, we stressed the importance of the "nexus between the wage and price standards and likely savings to the government." *Id.* It will be recalled that one of appellants' claims is that the Executive Order did not demonstrate that nexus. It does not follow, then, that the President's broad authority under the Procurement Act precludes judicial review of executive action for conformity with that statute—let alone review to determine whether that action violates another statute.

Judicial review here, moreover, is entirely consistent with the Court's statement in *Dalton* that certain types of statutory claims based on an abuse of discretion by the President are not reviewable.[4] In *Dalton*, the Court refused to review President Bush's decision, pursuant to the Defense Base Closure and Realignment Act of 1990, to approve a Commission's recommendation to close, among other bases, the Philadelphia Naval Shipyard. The Court concluded that "[w]here a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." *Dalton,* —— U.S. at ——, 114 S.Ct. at 1728. In reaching this conclusion, the Court noted that the statute "does not *at all* limit the President's discretion in approving or disapproving the Commission's recommendations ... nothing in [the statute] prevents the President from approving or disapproving the recommendations for *whatever reason* he sees fit." *Id.* (emphases added). The Court explained that "our conclusion that judicial review is not available for respondents' claim follows from our interpretation of [the] Act." *Id.*

The district court appeared concerned that *Dalton* might be interpreted to repudiate *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). *See* 897 F.Supp. 570, 576. We think that concern—expressed by the litigants in *Dalton*—is much overdrawn. *Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains no limitations on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available.[5]

4. The *Dalton* Court did cast some doubt on non-statutory judicial review of presidential action. The Court declined to address the question merely stating that "[w]e may assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA." *Dalton,* —— U.S. at ——, 114 S.Ct. at 1727. The *Dalton* Court's hesitancy to review presidential action appears to be based on the special status of the President, a status the Court has recognized before. *See, e.g., Franklin,* 505 U.S. at 798, 112 S.Ct. at 2775 (holding that the President is not an "agency" for APA purposes); *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 18 L.Ed. 437 (1867) (refusing to permit an injunction to be placed directly against President Andrew Johnson). But that concern suggests a reluctance to bring judicial power to bear directly on the President. Of course, here we are concerned with the long established non-statutory review of a claim directed at a subordinate executive official.

5. The Court's citations in *Dalton* to *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *United States v. George S. Bush & Co.,* 310 U.S. 371, 60 S.Ct. 944, 84 L.Ed. 1259 (1940); and *Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne,* 250 U.S. 163, 39 S.Ct. 507, 63 L.Ed. 910 (1919), provide further indications of the Court's limited holding. In all these cases, special rea-

sons existed for concluding that judicial review was precluded. In *Waterman,* judicial review of a presidential decision to deny an international air route to an airline was said to be unavailable because it would "embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate." 333 U.S. at 114, 68 S.Ct. at 437. The Court in *Bush* held that judicial review was not available for a challenge to the factual basis of the President's decision to change a tariff rate. It explained that the "judgment of the President that on the facts, *adduced in pursuance of the procedure prescribed by Congress,* a change of rate is necessary is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment." 310 U.S. at 379–80, 60 S.Ct. at 946 (emphasis added). Finally, *Dakota Central* concerned an action of the President taken pursuant to a congressional joint resolution which authorized "the President during the continuance of the present war ... whenever he shall deem it necessary for the national security or defense, to supervise or to take possession and assume control of any ... telephone [lines]." 250 U.S. at 181, 39 S.Ct. at 508. The Court refused to consider a claim that the President abused the discretion granted him under the joint resolution because "it involves considerations which are beyond the reach of judicial power." *Id.* at 184, 39 S.Ct. at 509. Such

*Dalton* is inapposite where the claim instead is that the presidential action—not one, it should be added, even contemplated by Congress—independently violates the NLRA, a statute that delegates no authority to the President to interfere with an employer's right to hire permanent replacements during a lawful strike.

In sum, we think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President *claims* that he is acting pursuant to the Procurement Act in the pursuit of governmental savings. Yet this is what the government would have us do. Its position would permit the President to bypass scores of statutory limitations on governmental authority, and we therefore reject it.

### III.

■ Appellants' most powerful argument on the merits, it strikes us, is their claim that the Executive Order is in conflict with the NLRA. If that is so, it is unnecessary to decide whether, in the absence of the NLRA, the President would be authorized (with or without appropriate findings) under the Procurement Act and the Constitution to issue the Executive Order. It is, in that regard, undisputed that the NLRA preserves to employers the right to permanently replace economic strikers as an offset to the employees' right to strike. Almost 60 years ago, the Supreme Court explained that an employer retained the right "to protect and continue his business by supplying places left vacant by strikers. And he is not bound to discharge those hired to fill the places of strikers, upon the election of the latter to resume their employment, in order to create places for them." *NLRB v. Mackay Radio & Tel. Co.*, 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–11, 82 L.Ed. 1381 (1938). The Court has repeatedly approved and reaffirmed *Mackay Radio. See, e.g., NLRB v. Curtin Matheson*

*Scientific, Inc.*, 494 U.S. 775, 790, 110 S.Ct. 1542, 1551, 108 L.Ed.2d 801 (1990); *Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants*, 489 U.S. 426, 433–34, 109 S.Ct. 1225, 1230–31, 103 L.Ed.2d 456 (1989); *Belknap, Inc. v. Hale*, 463 U.S. 491, 504–05 n. 8, 103 S.Ct. 3172, 3179–80 n. 8, 77 L.Ed.2d 798 (1983); *NLRB v. International Van Lines*, 409 U.S. 48, 50, 93 S.Ct. 74, 76, 34 L.Ed.2d 201 (1972); *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967); *NLRB v. Brown*, 380 U.S. 278, 292 & n. 6, 85 S.Ct. 980, 988 & n. 6, 13 L.Ed.2d 839 (1965); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 232, 83 S.Ct. 1139, 1147, 10 L.Ed.2d 308 (1963); *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96, 77 S.Ct. 643, 647, 1 L.Ed.2d 676 (1957).

The government would have us look at the case somewhat differently. Although nothing in the Procurement Act, passed in 1949 long after the original version of the NLRA, addresses labor relations—let alone the specific issue of replacement of strikers—the government, as we have noted, emphasizes the broad discretion that statute bestows on the President to set procurement policy for the entire government. Presidents have sought to affect, *inter alia*, the private employment practices of government contractors under that authority by issuing Executive Orders designed to ensure equal employment opportunities, *see* E.O. 11,246, 3 C.F.R. 339 (1964–65 Compilation) (1965); E.O. 11,141, 3 C.F.R. 179 (1964–65 Compilation), *reprinted in* 5 U.S.C. § 3301 Note (1976); E.O. 11,114, 3 C.F.R. 774 (1959–63 Compilation) (1963); E.O. 10,925, 3 C.F.R. 448 (1959–63 Compilation) (1961); E.O. 10,557, 3 C.F.R. 203 (1954–58 Compilation) (1954); E.O. 10,479, 3 C.F.R. 961 (1949–53 Compilation) (1953), and to limit the size of wage increases, *see* E.O. 12,092, 43 Fed.Reg. 51,375 (1978). These Orders were sustained in courts of appeals against attacks that asserted, *inter alia*, that the President exceeded his authority under the Procurement Act. *See Contractors Ass'n of*

---

considerations would obviously involve what was necessary for the "national security" or "defense" during wartime—an analysis that the Court was legitimately wary of engaging in. Sig-

nificantly, the Court did consider, although ultimately rejected, an argument that there was an "absence of power in the President" to take the action that he did. *Id.*

*Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied sub nom. Contractors Ass'n of Eastern Pennsylvania v. Hodgson,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Kahn,* 618 F.2d 784. The government calls our attention to two Executive Orders issued by President Bush that actually dealt with matters covered by the NLRA. One of those barred government contractors from signing pre-hire agreements expressly permitted under the construction industry proviso to § 8(e) of the NLRA, *see* E.O. 12,818, 57 Fed.Reg. 48,713 (1992), and another required government contractors to post notices informing their employees that they could not be required to join or remain a member of a union, *see* E.O. 12,800, 57 Fed.Reg. 12,985 (1992). (Neither of these orders provoked litigation so no court passed on their legality.)

Accordingly, the government suggests that if the authority to issue the Executive Order can be found in the broad reaches of the Procurement Act—the later statute—that is the end of the matter. The government explains "[t]here can be no conflict between the President's legitimate exercise of authority under the Procurement Act and [the NLRA rights] relied on by appellants." The implication of this argument, if we understand it correctly, is that if there is tension, or perhaps even conflict, between the two statutes, the Procurement Act trumps the NLRA. But the government's argument runs against the canon of statutory construction: "[t]he cardinal rule ... that repeals by implication are not favored." *Traynor v. Turnage,* 485 U.S. 535, 547, 108 S.Ct. 1372, 1381, 99 L.Ed.2d 618 (1988) (quoting *Morton v. Mancari,* 417 U.S. 535, 549–50, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974)). The later statute displaces the first only when the statute "expressly contradict[s] the original act" or if such a construction "is absolutely necessary ... in order that [the] words [of the later statute] shall have any meaning at all." *Id.* at 548, 94 S.Ct. at 2481 (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976)); *see also Wood v. United States,* 41

U.S. (16 Pet.) 342, 363, 10 L.Ed. 987 (1842) (there should be a "manifest and total repugnancy in the provisions, to lead to the conclusion that the [more recent laws] abrogated, and were designed to abrogate the [prior laws].").  Furthermore, the Supreme Court has emphasized that "[w]here there is no *clear* intention otherwise, a specific statute will not be controlled or nullified by a general one...." *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987) (quoting *Radzanower,* 426 U.S. at 153, 96 S.Ct. at 1992) (emphasis added in *Crawford Fitting*); *see also Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 524, 109 S.Ct. 1981, 1992, 104 L.Ed.2d 557 (1989). The Procurement Act was designed to address broad concerns quite different from the more focused question of the appropriate balance of power between management and . labor in collective bargaining. The text of the Procurement Act and its legislative history indicate that Congress was troubled by the absence of central management that could coordinate the entire government's procurement activities in an efficient and economical manner. The legislative history is replete with references for the need to have an "efficient, businesslike system of property management." S.Rep. No. 475, 81st Cong., 1st Sess. 1 (1949); *see also* H.R.Rep. No. 670, 81st Cong. 1st Sess. 2 (1949).

The President's authority to pursue "efficient and economic" procurement, *see* 40 U.S.C. § 486(a), to be sure, has been interpreted to permit such broad ranging Executive Orders as 11,246 and 12,092, respectively guaranteeing equal employment opportunities, and restricting wage increases on the part of government contractors—measures which certainly reach beyond any narrow concept of efficiency and economy in procurement. But in those cases, the Third Circuit and this court did not perceive any conflict with another federal statute.[6] Here, undeniably there is some tension between the President's Executive Order and the NLRA. To determine whether that tension constitutes unacceptable conflict we look to the extensive

---

6. In *Kahn,* we concluded that since the Executive Order did not "subvert the integrity of [the col-

lective bargaining] process" the NLRA was not implicated. 618 F.2d at 796.

body of Supreme Court cases that mark out the boundaries of the field occupied by the NLRA. Since the progenitors of these cases originally arose in the context of state actions that were thought to interfere with the federal statute, they are referred to collectively as establishing the NLRA "pre-emption doctrine." The principles developed, however, have been applied equally to federal governmental behavior that is thought similarly to encroach into the NLRA's regulatory territory.

The Supreme Court has crafted two different types of NLRA pre-emption. *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 748, 105 S.Ct. 2380, 2393, 85 L.Ed.2d 728 (1985). *Garmon* pre-emption "forbids state and local regulation of activities that are 'protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8.'" *Building & Constr. Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island*, 507 U.S. 218, 224, 113 S.Ct. 1190, 1194, 122 L.Ed.2d 565 (1993) (*Boston Harbor*) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)); *see also Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 290–91, 91 S.Ct. 1909, 1919–20, 29 L.Ed.2d 473 (1971). Justice Frankfurter explained that "[a]dministration is more than a means of regulation; administration is regulation. We have been concerned with conflict in its broadest sense; conflict with a complex and interrelated federal scheme of law, remedy and administration." *Garmon*, 359 U.S. at 243, 79 S.Ct. at 778. *Machinists* pre-emption, on the other hand, prohibits regulation of areas that Congress intended to be left "unregulated and to be controlled by the free play of economic forces." *Lodge 76, International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 144, 96 S.Ct. 2548, 2555, 49 L.Ed.2d 396 (1976) (holding that a Wisconsin employment relations board could not find a refusal to work overtime, an action that did not violate the NLRA, an unfair labor practice). The underlying rationale is that union and management "proceed from contrary and to an extent antagonistic viewpoints and concepts of

self-interest.... The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft–Hartley Acts have recognized." *NLRB v. Insurance Agents' Int'l Union*, 361 U.S. 477, 488–89, 80 S.Ct. 419, 426–27, 4 L.Ed.2d 454 (1960). In fact, *Machinists* itself refers to the "hiring of permanent replacements" as an economic weapon available to an employer. 427 U.S. at 153, 96 S.Ct. at 2559.

Nor, as we have noted, is there any doubt that *Machinists* "pre-emption" applies to federal as well as state action. *Insurance Agents*, 361 U.S. 477, 80 S.Ct. 419, concerned the power of the NLRB itself to conclude that a union's concerted, on-the-job activities—such as refusing to perform customary duties at work—designed to put pressure on the employer to agree to an acceptable collective bargaining agreement were in violation of the union's duties under the NLRA. The Court held that since the union's activities were economic weapons preserved by the NLRA, the Board (which has the "primary responsibility for developing and applying national labor policy," *Curtin Matheson*, 494 U.S. at 786, 110 S.Ct. at 1549) lacked the power to conclude that the activities constituted a NLRA violation. The Court has described *Machinists* pre-emption as creating a "free zone from which all regulation, 'whether *federal* or State,' is excluded." *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 111, 110 S.Ct. 444, 451, 107 L.Ed.2d 420 (1989) (quoting *Machinists*, 427 U.S. at 153, 96 S.Ct. at 2559) (citation omitted); emphasis added); *see also Machinists*, 427 U.S. at 141, 96 S.Ct. at 2553 (explaining that *Machinists* pre-emption protects conduct that "Congress intended to be 'unrestricted by *any* governmental power to regulate'") (quoting *Insurance Agents*, 361 U.S. at 488–89, 80 S.Ct. at 426–27) (emphasis added in *Machinists*).

When the government acts as a purchaser of goods and services NLRA pre-emption is still relevant. In *Wisconsin Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986), the state of Wisconsin had passed a statute debarring persons or firms that had violated the NLRA three

times within a five year period from selling products to the state. The Supreme Court rejected Wisconsin's argument that its scheme escaped NLRA pre-emption because it was "an exercise of the State's spending power rather than its regulatory power." *Id.* at 287, 106 S.Ct. at 1061. The Court determined that, despite the form, "[t]he manifest purpose and inevitable effect of the debarment rule is to enforce the requirements of the NLRA." *Id.* at 291, 106 S.Ct. at 1063.[7]

The latest Supreme Court opinion on the subject, on which the government heavily relies, is *Boston Harbor*. In that case, an independent agency of the Massachusetts government, The Massachusetts Water Resources Authority (MWRA), faced with a federal court order directing it to clean up Boston Harbor, selected Kaiser Engineers, Inc. as its project manager with responsibility to advise MWRA as to work site labor-relations policy. Kaiser suggested, and MWRA agreed, that Kaiser be permitted to enter into a collective bargaining agreement with the Building and Construction Trades Council (BCTC). The agreement provided that all employees hired were obliged to become union members within seven days of their employment whether they were employed by the general contractor or any subcontractor. The bid specifications required that all bidding subcontractors agree to abide by the agreement. Such a "pre-hire" agreement in the construction industry is a legal option under § 8(f) of the NLRA as an exception to the general prohibition under § 8(e) against "hot cargo" agreements. Non-union construction contractors sued, asserting that the actions of the MWRA were pre-empted by the NLRA because the state agency was intruding into the collective bargaining process by forcing subcontractors to exercise the § 8(f) option. The First Circuit agreed over a dissent by then-Chief Judge Breyer and the Supreme Court reversed, determining that the bid specification was "not government regulation and that it is therefore subject to neither *Garmon* nor *Machinists* preemption." *Boston Harbor*, 507 U.S. at 232, 113 S.Ct. at 1199.

Of course, appellants argue that the case before us is controlled by *Gould* and distinguished from *Boston Harbor;* the government urges the opposite. The government points out that in *Gould*, Wisconsin conceded that its purpose was to deter labor law violations, *see* 475 U.S. at 287, 106 S.Ct. at 1061, so the Court was easily able to determine that the state sought to address conduct that was "unrelated to the employer's performance of contractual obligations to the State ..." *Boston Harbor*, 507 U.S. at 229, 113 S.Ct. at 1197. Echoing its arguments on reviewability, the government insists that the Executive Order is premised on the President's economic judgment that a government contractor's use of permanent replacements will cause longer, more contentious strikes and the loss of the accumulated skill of the strikers with correspondingly less efficient and economical performance by that contractor. That judgment, we are told, is certainly an economically rational one, and it is not up to a court to question either the President's motivation or the quality of his reasoning here any more than was done in *Contractors Ass'n,* 442 F.2d 159, or *Kahn,* 618 F.2d 784. Appellants, without directly challenging the President's economic analysis, observe that a struck company's use of permanent replacements is a good deal more efficient than temporary replacements; the Executive Order irrationally bars the former but not the latter.

We are similarly quite reluctant to consider the President's motivation in issuing the Executive Order. Chief Judge Breyer's dissent in *Boston Harbor*, on which the Supreme Court heavily relied, put the issue as

---

7. The Supreme Court's holding in that case was foreshadowed in a footnote, which addressed a *Gould*-like prohibition *at the federal level*, in our opinion in *Kahn:*

> Amicus argues that a decision upholding Executive Order 12092 would give the President power, for example, to establish by Executive Order the sort of program proposed in the National Labor Reform Act of 1977, which was

not enacted, that "willful" violators of the National Labor Relations Act should be suspended from seeking Government contracts for three years. The approach we take today might raise serious questions about the validity of such an Order, but we need not reach that issue here.

618 F.2d at 793 n. 50 (citation omitted).

follows: "In the case before us, the record makes clear that the MWRA is participating in a market place as a general contractor, like a private buyer of services. Its role as buyer is not, in any sense, a *sham* designed to conceal an effort to regulate." *Associated Builders & Contractors of Massachusetts/Rhode Island v. Massachusetts Water Resources Auth.*, 935 F.2d 345, 366 (1st Cir. 1991) (en banc) (Breyer, C.J., dissenting) (emphasis added). We do not think we are bound to that dichotomy, however—particularly when considering the President's Executive Order. It is not necessary for us to question the President's motivation in order to determine whether the Order is a regulation that is pre-empted by *Machinists*.

The Supreme Court in *Boston Harbor*, quoting Chief Judge Breyer, explained, "when the MWRA, acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not 'regulate' the workings of the market forces that Congress expected to find; it exemplifies them." 507 U.S. at 233, 113 S.Ct. at 1199 (quoting *Associated Builders*, 935 F.2d at 361 (Breyer, C.J., dissenting)). The district court here appeared, at points, to read this formulation as suggesting that if a private contractor were permitted to refuse to buy goods from an employer who permanently replaced strikers—which ordinarily he would be—then so should the federal government. Appellants contend, on the other hand, that *Boston Harbor*'s reasoning makes the test turn on how typical the behavior would be as conducted by private contractors. The government—as least before us—disavows the permissibility test by itself and instead offers a modification. A public entity exercising its spending power acts as regulator if its actions "go[ ] beyond the conduct that would be normally or economically rational for a private party." The government condemns appellants' typicality test as practically unworkable, and appellants argue that it would be hardly rational

for a private contractor to buy goods from a struck employer who has hired temporary replacements, but refuse the goods of a struck employer who has hired permanent replacements.

We do not think it is necessary to resolve this doctrinal dispute in this case. We would be surprised if private contractors were to care whether a struck supplier hired permanent or temporary replacements, so long as the goods or services contracted for were provided in a timely fashion and met quality standards. There may well be, however, some companies who, for political or philosophic reasons—what the Supreme Court referred to as a "labor policy concern," *Boston Harbor*, 507 U.S. at 229, 113 S.Ct. at 1197— would not wish to do business with a struck company that hired permanent replacements.[8] But even if that behavior were a good deal more common than we suppose, we would still regard the Executive Order as regulatory in character.

In *Boston Harbor*, the Court's analysis of the behavior of MWRA was based on the premise, stated after its summary of its precedent, that:

> When the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role, boycotts notwithstanding. Moreover, as regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant *with no interest in setting policy*. . . . We left open [in *Gould*] the question whether a State may act without offending the preemption principles of the NLRA when it acts as a proprietor and its acts therefore are not "*tantamount* to *regulation*," or *policy-making*.

*Id.* at 229, 113 S.Ct. at 1197 (emphases added). The premise on which the Court's further analysis rested, then, was that the Massachusetts governmental entity, MWRA, was not seeking to set general policy in the Commonwealth; it was just trying to operate as if

---

8. If the purchaser were obliged to cease doing business with the supplier because of coercion from its own union, that would constitute an illegal secondary boycott under § 8(b)(4) of the NLRA.

it were an ordinary general contractor whose actions were "specifically tailored to one particular job, the Boston Harbor clean-up project." *Id.* at 232, 113 S.Ct. at 1198.[9] Surely, the result would have been entirely different, given the Court's reasoning, if Massachusetts had passed a general law or the Governor had issued an Executive Order requiring all construction contractors doing business with the state to enter into collective bargaining agreements with the BCTC or its Massachusetts-wide counterpart containing § 8(e) pre-hire agreements. Accordingly, we very much doubt the legality of President Bush's Executive Order 12,818—since revoked, but upon which the government relies—that banned government contractors from entering into pre-hire agreements under § 8(f).[10]

It does not seem to us possible to deny that the President's Executive Order seeks to set a broad policy governing the behavior of thousands of American companies and affecting millions of American workers. The President has, of course, acted to set procurement policy rather than labor policy. But the former is quite explicitly based—and would have to be based—on his views of the latter. For the premise of the Executive Order is the proposition that the permanent replacement of strikers unduly prolongs and widens strikes and disrupts the proper "balance" between employers and employees. Whether that proposition is correct, or whether the prospect of permanent replacements deters strikes, and therefore an employer's right to permanently replace strikers is simply one element in the relative bargaining power of management and organized labor, is beside the point. Whatever one's views on the issue, it surely goes to the heart of United States labor relations policy.

It cannot be equated to the *ad hoc* contracting decision made by MWRA in seeking to clean up Boston Harbor.

That is not to say that the President, in implementing the Procurement Act, may not draw upon any secondary policy views that deal with government contractors' employment practices—policy views that are directed beyond the immediate quality and price of goods and services purchased. In *Kahn*, we recognized that the imposition of wage and price controls as a condition of eligibility for government contractors could result in the government actually paying more for individual government contracts than might be so otherwise. 618 F.2d at 793. We thought, however, the President's judgment that the overall impact of those controls would reduce government procurement costs was entitled to deference. *Id.* And, in *Contractors Ass'n,* the Third Circuit's opinion contained only the briefest discussion of the impact on cost of the Executive Order's requirement of an affirmative action covenant in federally assisted construction contracts. The court merely noted that this requirement would increase the pool of qualified labor and thereby reduce costs. 442 F.2d at 171. But labor relations policy is different because of the NLRA and its broad field of pre-emption. No state or federal official or government entity can alter the delicate balance of bargaining and economic power that the NLRA establishes, whatever his or its purpose may be.

If the government were correct, it follows, as the government apparently conceded, that another President could not only revoke the Executive Order, but could issue a new order that actually *required* government contractors to permanently replace strikers, premised on a finding that this would minimize

9. In the Court's discussion of *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (holding that Los Angeles could not condition renewal of a taxi cab franchise upon settlement of a labor dispute), it observed that if the taxi company had been providing services to the city and "if the strike had produced serious interruptions in the services the city had purchased, the city would *not necessarily* have been pre-empted from advising Golden State that it would hire another company if the labor dispute were not resolved and ser-

vices resumed by a specific deadline." *Boston Harbor,* 507 U.S. at 227–28, 113 S.Ct. at 1196 (emphasis added).

10. We also are dubious that President Bush's Executive Order 12,800, which required government contractors to post notices informing their employees that they could not be required to join or remain a member of a union, was legal. It may well have run afoul of *Garmon* pre-emption which reserves to NLRB jurisdiction arguably protected or prohibited conduct.

unions' bargaining power and thereby reduce procurement costs. Perhaps even more confusing, under the government's theory, the states would be permitted to adopt procurement laws or regulations that in effect choose sides on this issue, which would result in a further balkanization of federal labor policy. Yet the whole basis of the Supreme Court's NLRA pre-emption doctrine has from the outset been the Court's perception that Congress wished the " 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.' " *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971) (quoting *Garner v. Teamsters Union,* 346 U.S. 485, 490, 74 S.Ct. 161, 165, 98 L.Ed. 228 (1953)).

The government insists that the President's intervention into the area of labor relations is quite narrow. In contrast to the Wisconsin debarment scheme in *Gould,* the Executive Order does not provide for automatic contract termination or debarment of contractors. The government emphasizes the discretion that the Secretary and contracting agencies have in deciding whether to impose the Executive Order's penalties on contractors who hire permanent replacements. The Secretary *may* terminate a contract if a contractor has permanently replaced strikers and only if the agency head does not object. The Secretary is also given discretion as to whether to debar a contractor and cannot debar a contractor if an agency head concludes that there is a compelling reason not to do so. The Executive Order's flexibility is said to ensure that intervention into labor relations only occurs to the extent necessary to guarantee efficient and economical procurement.

We do not think the scope of the President's intervention into and adjustment of labor relations policy is determinative, but despite the government's protestations, the impact of the Executive Order is quite far-reaching. It applies to *all* contracts over $100,000, and federal government purchases totaled $437 billion in 1994, constituting approximately 6.5% of the gross domestic product. STATISTICAL ABSTRACT OF THE UNITED STATES 451 (1995). Federal contractors and subcontractors employ 26 million workers, 22% of the labor force. GAO REPORT. The Executive Order's sanctions for hiring permanent replacements, contract debarment and termination, applies to the organizational unit of the federal contractor who has hired permanent replacements. The organizational unit includes "[a]ny other affiliate of the person that *could* provide the goods or services required to be provided under the contract." 60 Fed.Reg. at 27,861 (emphasis added). If a local unit of Exxon had a contract to deliver $100,001 worth of gas to a federal agency, the organizational unit would include all the other affiliates of Exxon that could have provided the gas; no doubt a significant portion of the Exxon corporation. The broad definition of "organizational unit" will have the effect of forcing corporations wishing to do business with the federal government not to hire permanent replacements even if the strikers are not the employees who provide the goods or services to the government. Indeed, corporations who even hope to obtain a government contract will think twice before hiring permanent replacements during a strike. It will be recalled that in *Kahn,* 618 F.2d at 792–93, the government itself asserted that controls imposed on government contractors—given the size of that portion of the economy—would alter the behavior of non-government contractors.

Not only do the Executive Order and the Secretary's regulations have a substantial impact on American corporations, it appears that the Secretary's regulations promise a direct conflict with the NLRA, thus running afoul not only of *Machinists* but the earlier *Garmon* pre-emption doctrine. Under the regulations, the Secretary assumes responsibility for determining when a "labor dispute" ends, thereby permitting an employer who is debarred because he used permanent replacements to be declared eligible. But the regulations contemplate that the Secretary will not declare the "labor dispute" over without the striking union's approval (which enables either strikers to return to work thus ousting the replacements or a collective bargaining agreement to be reached, both of which are factors listed in the regulations for supporting the conclusion that a "labor dis-

pute" has ended. *See* 60 Fed.Reg. at 27,862). Under the NLRA, however, an employer's duty to bargain with a striking union after the strikers have been replaced ends if a year has passed since certification and he has a good faith doubt as to the union's majority status, or the union does not in fact have majority status. *See Curtin Matheson,* 494 U.S. at 778, 110 S.Ct. at 1544. If after a union lost majority status an employer were to continue to recognize the union as the exclusive representative—the recognition of which the Secretary's regulations would seem to induce—the employer would be committing an unfair labor practice. *See International Ladies' Garment Workers v. NLRB,* 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).

\*    \*    \*    \*    \*    \*

We, therefore, conclude that the Executive Order is regulatory in nature and is preempted by the NLRA which guarantees the right to hire permanent replacements. The district court is hereby

*Reversed.*