# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 16, 2022          Decided July 18, 2023

No. 20-5008

AMERICAN FOREST RESOURCE COUNCIL,
APPELLEE

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

SODA MOUNTAIN WILDERNESS COUNCIL, ET AL.,
APPELLANTS

---

Consolidated with 20-5009, 20-5010, 20-5011, 22-5019,
22-5020, 22-5021

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:17-cv-00441)
(No. 1:17-cv-00280)
(No. 1:15-cv-01419)
(No. 1:16-cv-01599)
(No. 1:16-cv-01602)

---

*Brian C. Toth*, Attorney, U.S. Department of Justice, argued the cause for federal appellants. With him on the briefs were *Todd Kim*, Assistant Attorney General, and *Robert J. Lundman*, Attorney. *Mark R. Haag*, Attorney, entered an appearance.

*Kristen L. Boyles* argued the cause for appellants Soda Mountain Wilderness Council, et al. With her on the briefs was *Susan Jane M. Brown. Patti A. Goldman* entered an appearance.

*Julia K. Forgie* and *Katherine Desormeau* were on the brief for *amicus curiae* Natural Resources Defense Council in support of appellants.

*David O. Bechtold, Per A. Ramfjord,* and *Julie A. Weis* argued the causes for appellees. With them on the brief were *Sarah Ghafouri, Jason T. Morgan, Ariel Stavitsky,* and *Caroline Lobdell.*

*Frank D. Garrison, Clerk M. Neily III,* and *Damien M. Schiff* were on the brief for *amici curiae* Pacific Legal Foundation and Cato Institute in support of appellees.

Before: HENDERSON and PAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In these consolidated appeals we face the question whether overlapping statutes that affect more than two million acres of federally owned forest land in southwestern Oregon are reconcilable and therefore operative. The appeals arise from three sets of cases filed by an association of fifteen Oregon counties and various trade associations and timber companies. Two of the cases challenge Proclamation 9564, through which the President expanded the boundaries of the Cascade-Siskiyou National Monument. Two others challenge resource management plans that the United States Bureau of Land Management (BLM), a bureau within the United States Department of the Interior (Interior), developed to govern the use of the forest land. The final case seeks an order compelling the Interior Secretary to offer a certain amount of the forest's timber for sale each year. The district court entered summary judgment for the plaintiffs in all five cases. As detailed *infra*, we reverse.

## I.  BACKGROUND

### A.  THE O & C ACT

We begin in 1866, when the Congress authorized a grant of public land to two railroad companies to facilitate the construction of a rail and telegraph line between Portland, Oregon and San Francisco, California. Act of July 25, 1866, ch. 242, 14 Stat. 239; *see also Clackamas Cnty. v. McKay*, 219 F.2d 479, 481–82 (D.C. Cir. 1954) (recounting grant's history), *vacated as moot*, 349 U.S. 909 (1955). For each mile of railroad the companies completed, they received every odd numbered, alternate section of public land "to the amount of

twenty alternate sections per mile (ten on each side) of [the] railroad line." Act of July 25, 1866, § 2, 14 Stat. 239–40; *see also* David Maldwyn Ellis, *The Oregon and California Railroad Land Grant, 1866–1945*, 39 PAC. N.W. Q. 253, 277 (1948) (reciting conditions of grant). There were no restrictions on the railroads' authority to sell or otherwise dispose of the land.

Three years later, the Congress amended the grant to require the railroads to sell granted land to "actual settlers only, in quantities not greater than one-quarter section to one purchaser, and for a price not exceeding two dollars and fifty cents per acre." Act of Apr. 10, 1869, ch. 27, 16 Stat. 47; *see also Clackamas Cnty.*, 219 F.2d at 483 ("The railroads through sale of the land were supplied with funds, and the condition that the land be sold to setters in small parcels and at a cheap price was to serve the cause of extensive settlement."). The railroads did not abide by these terms[1] and, in 1916, the Congress responded by revesting title in all of the land the railroads had not sold—about 2.9 million acres—in the United States. *See* Chamberlain-Ferris Act, ch. 137, 39 Stat. 218 (1916). It directed the Interior Secretary to classify the revested land (O & C land), "by the smallest legal subdivisions thereof," into three categories: timberland, power-site land and agricultural land. *Id.* § 2, 39 Stat. at 219. It also directed the Secretary to

---

[1] *See* Michael C. Blumm & Tim Wigington, *The Oregon & California Railroad Grant Lands' Sordid Past, Contentious Present, and Uncertain Future: A Century of Conflict*, 40 B.C. ENV'T AFF. L. REV. 1, 12 (2013) ("By 1903, the [railroad] had sold 5306 tracts, totaling approximately 820,000 acres. These sales ranged from $5 to $40 per acre, and the railroad sold some 524,000 acres of the patented land in parcels greater than 160 acres."); *Clackamas Cnty.*, 219 F.2d at 482 ("The railroad . . . ma[de] sales of from 1,000 to 20,000 acres to one purchaser at prices ranging from $5 to $40 an acre and, in one instance, a sale of 45,000 acres at $7 an acre to a single purchaser.").

sell the timber on the portions classified as timberland "as rapidly as reasonable prices can be secured therefor in a normal market." *Id.* § 4, 39 Stat. at 219–20.

Handing 2.9 million acres of land back to the United States removed "huge tracts of land" from state and local property tax rolls. *Clackamas Cnty.*, 219 F.2d at 483. To make up for the consequent loss of tax revenue, the Congress directed the Secretary to compensate the affected counties (O & C counties) for the railroad companies' unpaid taxes and to create a "special fund" using the proceeds from O & C land and timber sales, which fund was to be distributed among several parties in a rather complex order. *See* Chamberlain-Ferris Act, §§ 9–10, 39 Stat. at 221–23.

The funding scheme, however, did not work as intended. Few timber sales occurred and, consequently, many O & C counties received no funds between 1916 and 1926. *See* Blumm & Wigington, *supra*, at 20. The Congress attempted to rehabilitate the scheme by enacting the Stanfield Act, ch. 897, 44 Stat. 915 (1926), but that attempt also failed, as it "merely shift[ed] the debts from the counties onto the U.S. Treasury," *Murphy Co. v. Biden*, 65 F.4th 1122, 1127 (9th Cir. 2023).

Undeterred by its earlier failures, the Congress again sought to remedy "the region's perilous economic and environmental situation," *id.*, *via* the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act (O & C Act), ch. 876, 50 Stat. 874 (1937) (codified as amended at 43 U.S.C. §§ 2601–2634). The third time was the charm; the O & C Act remains in effect today and is one of the subjects of these appeals. It provides, in pertinent part:

> [S]uch portions of the revested Oregon and California Railroad and reconveyed Coos Bay Wagon Road grant lands as are or may hereafter

come under the jurisdiction of the Department of the Interior, which have heretofore or may hereafter be classified as timberland[] . . . shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilties [sic] . . . .

The annual productive capacity for such lands shall be determined and declared as promptly as possible after August 28, 1937, but until such determination and declaration are made the average annual cut therefrom shall not exceed one-half billion feet board measure: *Provided*, That timber from said lands in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market.

43 U.S.C. § 2601. The O & C Act, as amended, further provides that one-half of the proceeds of O & C timber sales are to be distributed to the O & C counties. *Id.* § 2605(a); *see also* Blumm & Wigington, *supra*, at 21 ("[B]y 1981, the O & C counties and the U.S. Treasury were each entitled to 50% of timber receipts.").

Since 1937, the BLM[2] has carried out the O & C Act's directive to declare an "annual productive capacity," 43 U.S.C. § 2601, by establishing the "allowable sale quantity" (ASQ).[3] The ASQ is an estimate of the volume of O & C timber that can be cut and sold in a given year without depleting the timberland. In other words, it is "the capacity of the lands, allocated to sustained yield objectives, to produce timber at a level that will remain constant over time." A. 4843 (Salem district supporting data, resource management plan (RMP) evaluation report, 2012). The ASQ is thus "neither a minimum level that must be met nor a maximum level that cannot be exceeded," but "an approximation." A. 4892 (1995 RMP, Roseburg district). The actual volume of timber sold often deviates from the ASQ.

The ASQ has fluctuated over time, starting at 500 million board feet in 1937 and peaking at 1.2 billion board feet in 1972. *See Murphy*, 65 F.4th at 1127. Because the BLM administered the O & C timberland from 1937 until the 1980s with the principal goal of maximizing timber production,[4] the ASQ for those years was consistently high. From 1959 to 1976, for instance, the ASQ did not fall below 874 million board feet, and actual timber sales regularly exceeded one billion board

---

[2] The BLM was created in 1946 when the President combined the General Land Office and the Grazing Service. Before 1946, the O & C land was administered by the General Land Office. STEPHEN DOW BECKHAM, BUREAU OF LAND MGMT., O & C SUSTAINED YIELD ACT: THE LAND, THE LAW, THE LEGACY 13 (1987), https://www.blm.gov/sites/blm.gov/files/OC_History.pdf [https://perma.cc/9BSX-RR3L].

[3] "Allowable sale quantity" is synonymous with "annual productive capacity," "annual sustained yield capacity" and "sustained yield capacity." A. 2144 n.5.

[4] We use the terms "timber production" and "logging" interchangeably.

feet per year. *See* KATIE HOOVER, CONG. RSCH. SERV., R42951, THE OREGON AND CALIFORNIA RAILROAD LANDS: IN BRIEF 3–4 (2023).

But timber production on the O & C land plummeted in the late 1980s and early 1990s as the BLM attempted to reconcile the O & C Act's directive to manage O & C land for "permanent forest production," 43 U.S.C. § 2601, with other, later-enacted statues, especially the Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq., and the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq. The ESA requires all federal agencies to ensure that their actions are "not likely to jeopardize the continued existence" of any threatened or endangered species "or result in the destruction or adverse modification" of the species' designated critical habitat. 16 U.S.C. § 1536(a)(2). To comply with this obligation, federal agencies must "consult" with the expert wildlife agencies—the Fish and Wildlife Service (Interior Department) and the National Marine Fisheries Service (Commerce Department)—before taking action that could adversely affect listed species. *Id.* § 1536(a)(3); *see Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1079 (D.C. Cir. 2021).

In 1990, the Fish and Wildlife Service listed the northern spotted owl[5] as "threatened" based in part on "the loss and

---

[5] "The northern spotted owl is the largest of three subspecies of spotted owls, and inhabits . . . forests from southwestern British Columbia, through Washington and Oregon, and into northern California. . . . Northern spotted owls are medium-sized, chocolate brown owls with dark eyes, and they have round or irregular white spots on their head, neck, back, and underparts." *Northern Spotted Owl*, U.S. FISH & WILDLIFE SERV., https://www.fws.gov/species/northern-spotted-owl-strix-

adverse modification of suitable habitat as the result of timber harvesting." 55 Fed. Reg. 26114 (June 26, 1990). The owl's listing spawned a slew of litigation, which eventually culminated in the Northwest Forest Plan (NWFP). *See Seattle Audubon Soc'y v. Lyons*, 871 F. Supp. 1291, 1300–02 (W.D. Wash. 1994) (discussing history of northern spotted owl litigation), *aff'd sub nom. Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir. 1996). The NWFP governs all of the federal land administered by either the United States Forest Service (Agriculture Department) or the BLM that is within the northern spotted owl's range, including the O & C land.[6] *Id.* Among other actions, the NWFP (1) created "late-successional reserves" and "riparian reserves"[7] in which logging is generally

occidentalis-caurina (last visited June 28, 2023) [https://perma.cc/2B4A-U4QD].

[6] The NWFP covers 25 million acres of federal land, including 19 national forests and 7 BLM districts in California, Oregon and Washington. The O & C land makes up 11 per cent of the total NWFP management area. *See* HOOVER, *supra*, at 4 n.14.

[7] "Late-successional reserves [a]re intended to serve predominantly as habitat and riparian reserves [a]re intended to protect the water systems and their attendant species." *Pac. Rivers v. BLM*, No. 6:16-cv-01598-JR, 2018 WL 6735090, at *2 (D. Or. Oct. 12, 2018), *report and recommendation adopted*, 2019 WL 1232835 (D. Or. Mar. 15, 2019), *aff'd*, 815 F. App'x 107 (9th Cir. 2020); *see also* A. 3423 ("The objective of [l]ate-[s]uccessional [r]eserves . . . is to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species."); A. 3294 ("Riparian [r]eserves . . . maintain and restore riparian structures and functions of intermittent streams, confer benefits to riparian-dependent and associated species other than fish, enhance habitat conservation for organisms that are dependent on the transition zone between upslope and riparian areas, improve travel and dispersal corridors for many terrestrial animals and plants, and provide for greater connectivity of the watershed.").

prohibited in order to protect habitat for endangered species, including the northern spotted owl; (2) designated unreserved areas as "matrix" or "adaptive management areas" where timber harvesting can go forward subject to environmental restrictions; and (3) implemented an "aquatic conservation strategy"[8] that overlay reserve and matrix land with a system of watersheds where activities are restricted to protect water quality and aquatic species. *See Lyons*, 871 F. Supp. at 1304–05.

The BLM incorporated the NWFP's core principles into its 1995 RMPs for the O & C land.[9] Most notably, the 1995 RMPs, like the NWFP, divided the O & C land into reserves and matrix: 19 per cent of the O & C land was designated as late-successional reserves, 38 per cent as riparian reserves, and 28 per cent as matrix. *See Pac. Rivers* 2018 WL 6735090, at *2 (describing 1995 RMPs). Because the 1995 RMPs permitted logging only on land designated matrix, the reserve-heavy allocation dramatically reduced the O & C land's timber output. The 1995 RMPs declared an ASQ of 203 million board feet, far less than historic harvest levels. *See id.*

In 1994, various timber companies, including some of the plaintiffs here, filed several lawsuits against the Secretary. *See Am. Forest Res. Council v. Shea*, 172 F. Supp. 2d 24, 28 (D.D.C. 2001) (reciting procedural history). They argued that

---

[8] The "aquatic conservation strategy" is "a comprehensive plan designed to maintain and restore the ecological health of the waterways in federal forests." *Pac. Rivers*, 2018 WL 6735090, at *2.

[9] Under the Federal Land Policy and Management Act, the Secretary must "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). A "resource management plan" is "a land use plan as described by the Federal Land Policy and Management Act." 43 C.F.R. § 1601.0–5(n).

the proposed 1995 RMPs violated the O & C Act by holding back large tracts of O & C land from logging. The cases settled in 2003 and, as part of the settlement agreement, the Secretary agreed to revise the 1995 RMPs.

It was not until 2008 that the RMPs were revised. They established an ASQ of 502 million board feet, more than double the ASQ set by the 1995 RMPs. The 2008 RMPs were subsequently vacated because they were approved without the consultation required by section 7 of the ESA. *See Pac. Rivers Council v. Shepard*, No. 03:11-cv-00442-HU, 2011 WL 7562961 (D. Or. Sept. 29, 2011), *report and recommendation adopted*, 2012 WL 950032 (D. Or. Mar. 20, 2012). As a result, the 1995 RMPs were reinstated in 2012. *See Pac. Rivers Council*, 2012 WL 950032, at *4.

Revised RMPs were issued again in 2016. The 2016 RMPs are the subject of one portion of this appeal. Like the 1995 and 2008 RMPs, the 2016 RMPs divide O & C land into multiple management categories: 499,000 acres (20%) are designated as "harvest land base,"[10] 958,000 acres (38%) as late-successional reserves and 520,000 acres (21%) as riparian reserves. The remaining land is allocated to congressional reserves, national conservation land and district-designated reserves. The 2016 RMPs establish a total ASQ of 205 million board feet—slightly more than the ASQ set by the 1995 RMPs—and allow for the timber volume in fact sold to vary up to 40 per cent from the ASQ. *See Swanson Grp. Mfg. LLC v. Bernhardt*, 417 F. Supp. 3d 22, 27–28 & n.4 (D.D.C. 2019). The minimum timber volume the BLM must sell annually, then, is 123 million board feet and the maximum is 287 million board feet. As far as the

---

[10] Like "matrix" land, the "harvest land base" is managed to "achieve continual timber production that can be sustained through a balance of growth and harvest." *Pac. Rivers*, 2018 WL 6735090, at *2 n.4.

record discloses, the timber volume in fact sold has met or exceeded the ASQ every year since the 2016 RMPs were adopted.

## B. THE ANTIQUITIES ACT

As abstruse as the O & C Act's operation is, these lawsuits require us to interpret that legislation in light of earlier—and potentially conflicting—legislation; to wit, the Antiquities Act of 1906. The 1906 statute provides that "[t]he President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments." 54 U.S.C. § 320301(a). It further authorizes the "President [to] reserve parcels of land as a part of the national monuments" but requires that the parcels be "confined to the smallest area compatible with the proper care and management of the objects to be protected." *Id.* § 320301(b).

Since the Act's enactment, the Presidents have established 161 national monuments. *See National Monument Facts and Figures*, NATIONAL PARK SERVICE, https://www.nps.gov/subjects/archeology/national-monument-facts-and-figures.htm (last visited June 28, 2023) [https://perma.cc/87EY-6T47]. Indeed, all but three Presidents holding office since 1906 have invoked its authority. *See* CAROL HARDY VINCENT, CONG. RSCH. SERV., R41330, NATIONAL MONUMENTS AND THE ANTIQUITIES ACT 1 n.5 (2023).

Two of these appeals involve one such designation. In 2000, the President used the Antiquities Act to reserve approximately 53,000 acres of land in southwestern Oregon—including roughly 40,000 acres of O & C land—as the

Cascade-Siskiyou National Monument (the Monument). *See* Proclamation No. 7318, 65 Fed. Reg. 37249 (June 13, 2000).[11] The Monument was created to protect the region's "unique geology, biology, climate, and topography," including its "biological diversity," which, according to the Proclamation, is "unmatched in the Cascade Range." 65 Fed. Reg. at 37249. The Proclamation, in effect, outlaws logging within the Monument:

> The commercial harvest of timber or other vegetative material is prohibited, except when part of an authorized science-based ecological restoration project aimed at meeting protection and old growth enhancement objectives. . . . No portion of the monument shall be considered to be suited for timber production, and no part of the monument shall be used in a calculation or provision of a sustained yield of timber. Removal of trees from within the monument area may take place only if clearly needed for ecological restoration and maintenance or public safety.

65 Fed. Reg. at 37250.

In 2017, the President issued Proclamation 9564, which added roughly 48,000 acres to the Monument, including 40,000 acres of O & C land. *See* 82 Fed. Reg. 6145 (Jan. 18, 2017).

---

[11] Shortly after its issuance, several advocacy groups challenged Proclamation 7318, along with five other national monument designations, as unconstitutional under the Property Clause, U.S. CONST. art. IV, § 3, cl. 2, and as *ultra vires* vis-à-vis the Antiquities Act. We upheld the Monument's designation in *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002). Notably, however, the *Mountain States* plaintiffs did not argue that Proclamation 7318 conflicted with the O & C Act.

Proclamation 9564 provided that the expansion land is subject to the "same laws and regulations that apply to the rest of the monument," including the logging prohibition. *Id.* at 6149. As a result, roughly 10 million board feet of timber the BLM planned to sell during fiscal year 2017 could not be sold and the O & C counties missed out on an estimated $1.75 million in revenue. Going forward, the counties anticipate that the expansion will cause them collectively to lose between $1 million and $2 million of revenue annually.

## II. PROCEDURAL HISTORY

As noted, these appeals spring from five lawsuits. In two of the suits, which we call the "Monument cases," plaintiffs the American Forest Resource Council—a trade association that advocates for sustained yield logging on public timberland—and the Association of O & C Counties sued the United States, the President, the Secretary and the BLM (collectively, the Government). They challenged Proclamation 9564, the 2017 Proclamation that expanded the Monument. By outlawing logging on the O & C land included in the Monument, they asserted, the President violated the O & C Act's directive that O & C timberland "shall be managed . . . for permanent forest production." 43 U.S.C. § 2601. Notwithstanding their concession that he was authorized by the Antiquities Act to expand the Monument, they argued that he could not exercise that authority without violating the O & C Act. The Government responded that the claim is not subject to judicial review because neither the O & C Act nor Antiquities Act creates a private right of action and presidential action is not reviewable under the Administrative Procedure Act (APA). And even if the plaintiffs' claims are reviewable, the Government argued, the Monument's expansion was consistent with the O & C Act.

In two different lawsuits, which we refer to as the "Plan cases," the plaintiffs—the American Forest Resource Council, the Association of O & C Counties and other trade associations and companies in the timber industry—sued the BLM Director and the Secretary, contending that the 2016 RMPs violated the O & C Act by placing large swaths of O & C land in reserves where logging is not permitted. The Government responded that the 2016 RMPs were consistent with the discretion the O & C Act grants the Secretary and that they reasonably harmonized the Secretary's competing statutory obligations.

In the final lawsuit, the "Swanson case,"[12] the plaintiffs—companies in the timber industry—sought an order compelling the Secretary to sell a certain amount of timber each year. They argued that the O & C Act imposes upon the Secretary a non-discretionary duty to sell annually a volume of timber that is not less than the declared ASQ. The Government denied that the O & C Act created any such non-discretionary duty and also argued that, even assuming it did, the Secretary's compliance *vel non* was unreviewable under the APA because the volume of timber the Secretary offers for sale each year is not a "discrete" agency action. *See Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 64 (2004).

The district court entered summary judgment for the plaintiffs in all five cases. In the Monument cases, the court held that the O & C Act mandated timber production on all O & C timberland and precluded the expansion of the Monument, notwithstanding the President's Antiquities Act authority. *See Am. Forest Res. Council v. Hammond*, 422 F.

---

[12] Swanson Group Manufacturing LLC was a plaintiff in district court. Although the company was dismissed from the case in 2016, *see Swanson Grp. Mfg. LLC v. Jewell*, 195 F. Supp. 3d 66, 73 (D.D.C. 2016), the parties continue to refer to the case as the "Swanson case."

Supp. 3d 184, 192–93 (D.D.C. 2019). In the Plan cases, the court found that the O & C Act precluded the Secretary from reserving O & C land from timber production and that the ESA did not give the Secretary authority to disregard the timber-production mandate the O & C Act imposed. *Id.* at 191. Finally, in the Swanson case, the district court directed the Secretary to offer the ASQ for sale every year in perpetuity. *Swanson Grp. Mfg. LLC v. Bernhardt*, 417 F. Supp. 3d 22, 30 (D.D.C. 2019); *Am. Forest Res. Council v. Nedd*, 2021 WL 6692032, at \*6 (D.D.C. Nov. 19, 2021). The Government timely appealed.

## III. DISCUSSION

### A. REVIEWABILITY

Before we turn to the merits, we must decide whether the plaintiffs' claims are reviewable. The Government contends that the Monument cases are not judicially reviewable because there is no applicable statutory cause of action and because non-statutory review is unavailable where, as here, a plaintiff challenges a discretionary exercise of presidential authority based on an "at-most ambiguous limitation" from a separate statute. Appellant Br. at 33. We disagree.

Although the Government correctly notes that the O & C Act and the Antiquities Act are silent regarding judicial review and the APA's general review provision does not permit review of presidential action because the President is not an agency within the meaning of that statute, *see Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), the absence of a statutory review provision does not necessarily preclude judicial review of presidential action altogether. We have previously said that a claim alleging that the President acted in excess of his statutory authority is judicially reviewable even absent an applicable statutory review provision. *See, e.g.*,

*Chamber of Com. v. Reich*, 74 F.3d 1322, 1326–28 (D.C. Cir. 1996).[13]

The Government contends that even if non-statutory review of an *ultra vires* challenge to presidential action is available in some cases, review should be denied here because the Antiquities Act vests the President with broad discretion and the O & C Act puts no discernible limit on that discretion. For support, the Government cites the Supreme Court's statement in *Dalton v. Specter* that non-statutory review is unavailable "when the statute in question commits the decision to the discretion of the President." 511 U.S. at 474. As we explained in *Chamber of Commerce*, however, "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and contains *no limitations* on the President's exercise of that authority, judicial review of an abuse of discretion claim is not available." 74 F.3d at 1331 (emphasis added). *Dalton* has no force where, as here, "the claim instead is that the presidential action . . . independently violates [another statute]." *Id.* at 1332; *see also Mountain States*, 306 F.3d at 1136 ("Judicial review in such instances does not implicate separation of powers concerns to the same degree as where the statute did 'not at all limit' the discretion of the President." (quoting

---

[13] The United States Supreme Court has not yet decided if a claim that the President acted in excess of his statutory authority is subject to non-statutory review. When facing such a claim, the Court generally assumes review is available and rejects the claim on the merits. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018) (assuming without deciding *ultra vires* claim against President based on Immigration and Nationality Act is reviewable); *Dalton v. Specter*, 511 U.S. 462, 474 (1994) ("We may assume for the sake of argument that some claims that the President has violated a statutory mandate are judicially reviewable outside the framework of the APA.").

*Dalton*, 511 U.S. at 476)). We thus concluded in *Chamber of Commerce* that we could review a claim alleging that a Presidential order issued under the Federal Property and Administrative Services Act conflicted with the National Labor Relations Act (NLRA) even though the former vested "broad discretion" in the President. 74 F.3d at 1330–32.

That makes good sense. Even when the Congress gives substantial discretion to the President by statute, we presume it intends that the President heed the directives contained in other enactments. *See id.* at 1328 ("[C]ourts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986))). The Congress can and often does cabin the discretion it grants the President and it remains the responsibility of the judiciary to ensure that the President act within those limits. *See id.* at 1327; *Mountain States*, 306 F.3d at 1136.

Perhaps more to the point, we have consistently reviewed claims challenging national monument designations like the one challenged here. *See Mountain States*, 306 F.3d 1132; *Tulare Cnty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002); *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019). In those cases, we have reviewed claims that the President exceeded his authority under the Antiquities Act and claims that he violated a separate statute through an otherwise appropriate exercise of his Antiquities Act authority. In *Mountain States*, for example, the plaintiffs challenged a number of monument designations as statutorily *ultra vires*. *See* 306 F.3d at 1133. They argued the designations "reach[ed] far beyond the purpose, scope, and size of any national monuments contemplated by Congress under the [Antiquities]

Act" and were also "contrary to various statutes relating to the protection of environmental values on federal land." *Id.* We found both types of claims reviewable notwithstanding the broad discretion the Antiquities Act vests in the President. *See id.* at 1136–38.

*Massachusetts Lobstermen's Ass'n* is similarly instructive. There, commercial fishing associations challenged the presidential proclamation that created the Northeast Canyons and Seamounts Marine National Monument. 945 F.3d at 537. The fishermen argued, among other things, that the monument was incompatible with the National Marine Sanctuaries Act, a statute that authorizes the government to designate and manage marine sanctuaries in the "exclusive economic zone"—the span of ocean between 12 and 200 nautical miles off the Nation's coasts. *Id.* at 538–39 (quoting 16 U.S.C. § 1437(k)). We concluded that the claim was reviewable, again despite the President's Antiquities Act discretion. *See id.* at 540.

Like the plaintiffs in *Massachusetts Lobstermen's Ass'n* and *Mountain States*, the plaintiffs here argue that the President's exercise of authority under the Antiquities Act was *ultra vires* because it was inconsistent with an independent statute—the O & C Act. Consistent with our precedent, we easily conclude that the plaintiffs' claims are reviewable.

### B. MONUMENT CASES

We turn to the merits and begin with the Monument cases. The Government challenges the district court's decision that the President's expansion of the Monument constitutes an invalid use of his Antiquities Act authority because the expansion conflicts with the O & C Act. The Government makes two arguments. First, because the O & C Act is directed at the Secretary, it does not limit the *President's* authority to reserve land under the Antiquities Act. Second, the

Monument's expansion is consistent with the O & C Act because that Act does not mandate that every acre of O & C land be classified as timberland and, even for land that is so classified, the Act does not mandate that every acre be used solely for logging. Instead, the O & C Act contemplates a flexible concept of sustained yield management that permits the BLM to consider conservation values in making timber harvest decisions.

The Government's first contention need not long detain us. Although the O & C Act is addressed to the Secretary rather than to the President, that merely reflects the fact that the O & C land is administered by the Interior Department. The Congress usually directs its enactments to the executive official responsible for a program's administration rather than to the President himself. But that does not necessarily mean that the legislation does not also affect the President. For example, although the substantive provisions of the NLRA address the National Labor Relations Board, not the President, we concluded in *Chamber of Commerce* that the NLRA limited the *President's* discretion under the Procurement Act. *See Chamber of Com.*, 74 F.3d at 1332–33.

The O & C Act restricts the President's power to designate monuments under the Antiquities Act for the same reason the NLRA restricts the President's discretion under the Procurement Act: discretion conferred upon the President by the Congress is constrained by the limitations the Congress prescribes. Because the President relied solely on the Antiquities Act to expand the Monument, he was constrained by the Congress's other enactments in exercising that delegated power. *See Mountain States*, 306 F.3d at 1137 ("the President exercise[s] his *delegated* powers under the Antiquities Act" in creating monuments (emphasis added)); *see also United States v. California*, 332 U.S. 19, 27, *supplemented*, 332 U.S. 804

(1947) ("[N]either the courts nor the executive agencies[] could proceed contrary to an Act of Congress in [a] congressional area of national power.").

The provision of the O & C Act that the plaintiffs argue constrains the President's discretion, moreover, is written in the passive voice, *see* 43 U.S.C. § 2601 (O & C land "shall be managed . . . for permanent forest production . . . in conformity with the princip[le] of sustained yield"), suggesting that the directive applies without respect to a particular actor. *See Bartenwerfer v. Buckley*, 143 S. Ct. 665, 672 (2023) ("[T]he passive voice signifies that 'the actor is unimportant.'" (quoting B. GARNER, MODERN ENGLISH USAGE 676 (4th ed. 2016))); *see also Dean v. United States*, 556 U.S. 568, 572 (2009) ("The passive voice focuses on an event that occurs without respect to a specific actor."). The provision thus declares that *whoever* manages O & C land must do so "for permanent forest production." 43 U.S.C. § 2601.

The Government next contends the Monument's expansion is permissible because it is compatible with the O & C Act. Its argument, in effect, is that the Antiquities Act and the O & C Act can be harmonized. The Supreme Court has counseled that, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [we are] not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). A party suggesting two statutes cannot be reconciled "bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Id.* (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)). Accordingly, in reviewing an alleged statutory conflict, we must bear in mind the "'strong presumption' that repeals by implication are

'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Id.* (alterations accepted) (quoting *United States v. Fausto*, 484 U.S. 439, 452–53 (1988)).

We believe that the Antiquities Act and O & C Act are indeed compatible. We first observe that the 1937 O & C Act did not repeal the 1906 Antiquities Act, either explicitly or by implication. The O & C Act does not allude to the Antiquities Act, *see Murphy*, 65 F.4th at 1132, and the only evidence of implied repeal the plaintiffs point to—the O & C Act's generic *non-obstante* clause[14]—applies by its terms only to "Acts or parts of Acts in conflict with this Act." Act of Aug. 28, 1937, ch. 876, 50 Stat. 874, 876. The Antiquities Act, however, is not in conflict with the O & C Act. The O & C Act can reasonably be read in a manner that renders the statutes harmonious. Because it can be so read, it must be. *See Epic Sys. Corp.*, 138 S. Ct. at 1624.

First, the text of the O & C Act provides that only the "portions of the" O & C land "which have heretofore or may hereafter be classified as timberland[]" must be managed "for permanent forest production . . . in conformity with the princip[le] of sustained yield." 43 U.S.C. § 2601. In anticipating that only "portions" of the O & C land were to be classified as timberland, the Act necessarily implies that land may be classified as timberland or not. The land classified as timberland is subject to the statute's "permanent forest production" instruction but land not so classified is not. *See Murphy*, 65 F.4th at 1134 ("The Department's duty to oversee the lands is obligatory ('shall be managed'), but treating *every*

---

[14] The clause provides that "[a]ll Acts or parts of Acts in conflict with this Act are hereby repealed to the extent necessary to give full force and effect to this Act." Act of Aug. 28, 1937, ch. 876, 50 Stat. 874, 876.

parcel as timberland is not."). The Act's "or may hereafter" language indicates, moreover, that a parcel's timberland classification is not fixed; it may be reclassified in the future.

The O & C Act's text does not specify what officer or entity classifies O & C land, how land should be classified or what classifications exist aside from "timberland[]" and "power-site land[] valuable for timber." 43 U.S.C. § 2601. Nor does the Act require a fixed proportion of O & C land to be classified as timberland. In fact, the Act does not define "timberland." Given the Act's classification ambiguities and our obligation to reconcile the O & C Act and Proclamation 9564 if possible, *see Epic Sys. Corp.*, 138 S. Ct. at 1624, we believe the Act provides the Secretary with considerable discretion regarding the classification and reclassification of O & C land. Our conclusion accords with the decision we issued long ago in *Clackamas County*, where we observed that the O & C Act "conferred upon the Secretary of the Interior many duties requiring the exercise of his discretion and judgment," one such duty being the "classification of land." 219 F.2d at 487.

We are unpersuaded by the plaintiffs' contention that O & C lands were once, and thus must continue to be, classified "based on their productive capacity." Appellee Br. at 32. Granted, before the O & C Act was enacted, land was classified according to its capacity to produce timber. The Chamberlain-Ferris Act defined "timberland[ ]" as "land[] bearing a growth of timber not less than three hundred thousand feet board measure on each forty-acre subdivision." Chamberlain-Ferris Act, § 2, 39 Stat. at 219. That definition, however, was omitted from the O & C Act. We presume the omission was intentional. *See Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) ("Congress says what it means and means what it says."); *cf. Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 768 (D.C.

Cir. 2022) ("When Congress includes particular language in one section of a statute but omits it in another section of the same Act, courts presume that Congress knew what it was doing and meant for the omission to have significance." (cleaned up)). The O & C Act simply does not define "timberland" or establish a procedure for classifying O & C land. And we decline to fill in those gaps with provisions from the outdated Chamberlain-Ferris Act, legislation that was, after all, replaced by the O & C Act because of its defects. *See Clackamas Cnty.*, 219 F.3d at 486–87; *see also Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face.").

We believe Proclamation 9564 reclassified, albeit by implication, the 40,000 acres of O & C land the President added to the Monument as non-timberland, thereby removing the land from the O & C Act's "permanent forest production" mandate. Moreover, "[t]his is not a case where the executive's action eviscerate[d] Congress's land-management scheme, nor is it a case that concerns 'vast and amorphous expanses of terrain.'" *Murphy*, 65 F.4th at 1137–38 (quoting *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 981 (2021) (Roberts, C.J., statement respecting certiorari denial)). Rather, the Proclamation's Monument expansion was modest, affecting only 40,000—less than two per cent—of the more than two million acres of O & C land, and neither unduly interfering with the principal objective of the O & C Act nor abridging the Secretary's authority to regulate the vast bulk of the O & C land.[15] Moreover, although the principal

---

[15] The plaintiffs do not seriously dispute that land may be reclassified or that only land classified as timberland is subject to the O & C Act's timber-production mandate. Instead, they contend that "all the lands at issue here *are* classified as timberland[]." Appellee Br. at 32. But they provide no evidence—and we find none in the

management objective of the O & C Act is "permanent forest production . . . in conformity with the princip[le] of sustained yield," 43 U.S.C. § 2601; *see also Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1184 (9th Cir. 1990) ("[T]he O & C Act envisions timber production as a dominant use."), the Act also authorizes the Secretary to manage the O & C land for uses other than the production of timber, including "protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties," 43 U.S.C. § 2601. The Act grants the Secretary discretion to decide how best to implement and balance these objectives. *See Murphy*, 65 F.4th at 1134.[16]

---

record—manifesting that the land added to the Monument was in fact classified as timberland before the Proclamation was issued.

[16] The Congress's re-enactment of the Antiquities Act in 2014 without mention of the Monument further indicates that it did not intend the O & C Act to limit the Antiquities Act. "When Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *CFTC v. Schor*, 478 U.S. 833, 846 (1986) (cleaned up). The Congress first enacted the Antiquities Act in 1906 and the O & C Act in 1937. The President established the Monument in 2000. In 2009, the Congress enacted legislation that dealt with grazing rights, land swaps and wilderness preserves on the Monument. *See* Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, §§ 1401–05, 123 Stat. 991, 1026–32. Then, in 2014, the Congress recodified the Antiquities Act with no mention of the Monument. *See* Pub. L. No. 113-287, § 3, 128 Stat. 3094, 3259–60 (2014). This sequence of events suggests that the Congress has acquiesced in the Executive's interpretation of the Antiquities Act. *See Jackson v. Modly*, 949 F.3d 763, 773 & n.11 (D.C. Cir. 2020).

The O & C Act's history confirms that the Congress intended to give the Secretary flexibility to decide how best to carry out the program of "sustained yield" management. As we have explained, it was enacted to address two failures of the Chamberlain-Ferris Act and the Stanfield Act: "One was that they required the timber to be sold as rapidly as possible and the cut-over lands disposed of. The other was that they . . . creat[ed] a deficit due from the federal Treasury" to the O & C counties. *Clackamas Cnty.*, 219 F.2d at 487. To remedy these defects, the O & C Act "provided for the management of the timber on a conservation basis and for the payment to the counties of the net proceeds from the sales each year." *Id.*; *see also* H.R. Rep. No. 75-1119, at 2 (1937) (explaining that, under the earlier statutes, "[n]o provision was made for the administration of the land on a conservation basis looking toward the orderly use and preservation of its natural resources."). In lieu of the former clear-cutting regime, the O & C Act provided that timberland should be managed in accordance with the "innovative" principle of "sustained yield" so that the land's "natural assets could be 'conserved and perpetuated.'" *Murphy*, 65 F.4th at 1136 (quoting H.R. Rep. No. 75-1119, at 4). The goal of the O & C Act, then, was to "provide conservation and scientific management for this vast Federal property which now receives no planned management beyond liquidation of timber assets and protection from fire." H.R. Rep. No. 75-1119, at 2; *see also* S. Rep. No. 75-1231, at 1, 4 (1937) (statement of Acting Interior Secretary that "[p]roper protection of the interest of the communities, the States, and the Government requires a long-range program of planning, having for its object a well-regulated system of cutting, based upon the kind, character, and suitability of the timber, *rather than upon the actual presence on a given subdivision of a fixed amount of merchantable timber*." (emphasis added)).

In addition, the Monument's expansion is itself consistent with sustained yield forestry. The expansion "provides vital habitat connectivity, watershed protection, and landscape-scale resilience for the area's critically important natural resources." 82 Fed. Reg. at 6145. It effectuates the Act's aims of "protecting watersheds" and "regulating stream flow," *see* 43 U.S.C. § 2601, by protecting "hydrologic features" which are "vital to the ecological integrity of the watershed as a whole," 82 Fed. Reg. at 6147. It also helps to "provid[e] a permanent source of timber supply" in the long term, *see* 43 U.S.C. § 2601, by protecting the region's water and endangered species—both essential to maintaining a forest's vitality. Finally, the expansion provides recreational opportunities for residents and visitors, *see, e.g.*, 82 Fed. Reg. at 6147 ("Ornithologists and birdwatchers alike come to the Cascade-Siskiyou landscape for the variety of birds found here."); *id.* ("The landscape also contains many hydrologic features that capture the interest of visitors."), consistent with the O & C Act's aim of "providing recreational facil[i]ties," 43 U.S.C. § 2601.

In sum, the O & C Act provides the Secretary three layers of discretion: first, discretion to decide how land should be classified, which includes discretion to classify land as timberland or not, second, discretion to decide how to balance the Act's multiple objectives, and third, discretion to decide how to carry out the mandate that the land classified as timberland be managed "for permanent forest production." 43 U.S.C. § 2601.

## C. PLAN CASES

In the Plan cases, the plaintiffs contend that the 2016 RMPs violate the O & C Act because they place portions of O & C land in reserves where timber production is generally

prohibited. Their challenge, however, fails for the same reason the Monument plaintiffs' challenge to Proclamation 9564 fails: the 2016 RMPs do not violate the O & C Act. Rather, the 2016 RMPs are a permissible exercise of the Secretary's discretion under the O & C Act. The 2016 RMPs also reasonably harmonize the Secretary's O & C Act duties with her obligations under two other statutes—the ESA and the CWA.

First, the balance the 2016 RMPs strike between conservation and logging is a valid exercise of the Secretary's discretion under the O & C Act. The Act, as we have explained, gives the Secretary discretion in classifying the land, balancing the Act's multiple objectives and meeting the requirement that timberland be managed for permanent forest production in accordance with sustained yield principles. The 2016 RMPs fall well within that discretion.

The 2016 RMPs established two main types of reserves: late-successional reserves and riparian reserves. As we noted earlier, late-successional reserves were created to preserve critical habitat for the northern spotted owl and other endangered and threatened species. *See* A. 3423 ("The objective of [l]ate-[s]uccessional [r]eserves . . . is to protect and enhance conditions of late-successional and old-growth forest ecosystems, which serve as habitat for late-successional and old-growth related species."). Riparian reserves were created to "protect the water systems and their attendant species." *Pac. Rivers*, 2018 WL 6735090, at *2. Both categories of reserves are consistent with the O & C Act.

The creation of the reserves can reasonably be viewed as an exercise of the Secretary's discretion to reclassify O & C land as non-timberland, thus removing the land from the O & C Act's "permanent forest production" mandate. *See* 43 U.S.C. § 2601. The reserves also reasonably balance the O & C Act's

several objectives. Riparian reserves advance the aims of "protecting watersheds" and "regulating stream flow." *Id.* Those reserves, the 2016 RMPs explain, "provide substantial watershed protection benefits" and "help attain and maintain water quality standards, a fundamental aspect of watershed protection." A. 3126. They also "help regulate streamflows by moderating peak streamflows and attendant adverse impacts to watersheds." A. 3170. Both late-successional and riparian reserves also advance the Act's principal objective—providing a permanent source of timber supply—because a failure to protect endangered species (and their critical habitat) and water quality, both necessary for the continuing vitality of the forest ecosystem, would eventually limit the lands' timber production capacity. *See* A. 3678 ("Contributing to the conservation and recovery of listed species is essential to delivering a predictable supply of timber."). In addition, if the Secretary were to threaten further the endangered species on O & C land, litigation would likely result and injunctions against timber sales sought, potentially disrupting timber production. *See* A. 3677 ("Declining populations of species now listed under the Endangered Species Act have caused the greatest reductions and instability in the BLM's supply of timber in the past."); A. 4691 (between 1999 and 2007, "legal challenges" and other factors "greatly reduced" BLM's ability to sell timber); A. 4716, 4721 (timber production during the first decade after the NWFP's promulgation was about one-half of what was expected due to litigation and ESA requirements, among other factors); *see also Portland Audubon Soc'y v. Babbit*, 998 F.2d 705, 709–10 (9th Cir. 1993) (affirming injunction barring Secretary from selling timber across entire spotted owl range); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1037–38 (9th Cir. 2007) (invalidating incidental take statement for 75 timber sales); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562–63 (9th Cir. 2006) (setting aside timber-regeneration sales).

Second, both the ESA and the CWA support the establishment of reserves on O & C land. Late-successional reserves, as noted, were created primarily to preserve habitat for ESA-listed species. As the 2016 RMPs explain, northern spotted owls in particular require large, contiguous blocks of forest for habitat and late-successional reserves allow for the continuing existence of such blocks. Thus, the reserves are consistent with the ESA's requirement that the Secretary ensure her actions are "not likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of the species' designated critical habitat as well as its directive that the Secretary "review other programs administered by [her] and utilize such programs in furtherance of the purposes of this chapter." 16 U.S.C. § 1536(a)(1), (2).

The ESA supports the creation of riparian reserves because "[p]roviding clean water is essential to the conservation and recovery of listed fish, and a failure to protect water quality would lead to restrictions that would further limit the BLM's ability to provide a predictable supply of timber." A. 3678. And, as the 2016 RMPs recognize, "[t]he system of late-successional reserves and riparian reserves, watershed restoration, and the other components of the [RMPs'] aquatic conservation strategy provide a sound framework for meeting Clean Water Act requirements." A. 3128.

In short, the 2016 RMPs are well within the Secretary's discretion under the O & C Act and are consistent with the Secretary's other statutory obligations.

**D. SWANSON CASE**

The O & C Act provides that "timber . . . in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been

determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market." 43 U.S.C. § 2601. The Swanson plaintiffs contend that this language requires the Secretary to sell or offer for sale the declared annual sustained yield capacity—that is, the declared ASQ—every year. The Government contends that the O & C Act's timber-volume provision is not enforceable *via* the APA.

The Swanson plaintiffs' claim is brought under section 706(1) of the APA, which provides that a reviewing court shall "compel agency action unlawfully withheld." 5 U.S.C. § 706(1). As the Supreme Court has explained, a claim under section 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *SUWA*, 542 U.S. at 64; *see also* HARRY T. EDWARDS & LINDA A. ELLIOT, FEDERAL STANDARDS OF REVIEW: REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 144 (3d ed. 2018). The "discreteness" requirement is rooted in the APA's insistence upon "agency action" as a necessary predicate to judicial review. *See SUWA*, 542 U.S. at 62–63. An "agency action" is an agency's determination of rights and obligations, *see Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), by way of a "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13). All five categories of action listed in the APA's definition—rule, order, license, sanction and relief—are "circumscribed" and "discrete." *SUWA*, 542 U.S. at 62. And only an act or "failure to act" with "the same characteristic of discreteness" is reviewable under the APA. *Id.* at 63. Thus, a failure to act is challengeable under section 706(1) only if it is both an "agency action"—that is, an action involving the determination of rights and obligations—and is discrete.

To understand the reason that the plaintiffs' requested relief does not constitute discrete agency action, some

background on the Secretary's timber sale process is necessary. The sale process comprises three pre-sale phases: pre-planning, planning and preparation. In the pre-planning phase, the BLM collects information about forest and watershed conditions and access to each of the potential project areas, ascertains property lines through official land surveys, initiates pre-project clearance surveys for endangered species (some of which require two consecutive years of surveys), requests easements where its access is limited, develops preliminary timber harvest plans and initiates the public scoping process pursuant to the National Environmental Policy Act (NEPA). In the planning phase, the BLM completes its field evaluations, develops refined harvest plans and alternative project designs and prepares an environmental impact statement pursuant to NEPA, along with a biological assessment of the probable effect the sale will have upon ESA-listed species and their critical habitat. Finally, in the preparation phase, the BLM develops the final project design, issues a record of decision and prepares the timber sale contract and appraisal. The timber is then sold at auction pursuant to BLM regulations. *See* 43 C.F.R. pt. 5440. This complex process of planning, preparing and selling a timber contract generally takes between three and five years.

For a given fiscal year, the timber volume the BLM offers corresponds to the sum of all of the timber volumes offered for sale at all of the individual timber auctions conducted that year across the O & C land. Thus, the total timber volume sold comprises timber sales that can take years to finalize. The total timber volume the BLM offers for sale in a given year is thus not a discrete agency action. Instead, it is a measurement—a synthesis of multiple sales made over several years. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734–35 (1998) (rejecting argument that plaintiffs could "mount one legal challenge" to forest plan rather than "pursue many

challenges to each site-specific logging decision to which the Plan might eventually lead"). The total timber volume offered does not involve the determination of rights and obligations and is not a decision "from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). It is neither a litigable "determination" nor "decision."[17]

In this sense, the Swanson plaintiffs' request is analogous to the sort of "broad programmatic attack," *SUWA*, 542 U.S. at 64, the Supreme Court rejected in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890–91 (1990). There, the plaintiff challenged the BLM's "land withdrawal review program," which involved the status of millions of acres of federal land. *See id.* at 875–76. The Court held that the plaintiff could not "challenge the entirety of [the] so-called 'land withdrawal program'" because the program was "not an 'agency action' within the meaning of § 702." *Id.* at 890. The "land withdrawal program," it reasoned, "does not refer to a single BLM order or regulation" but rather "is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands." *Id.* As such, it was not "an identifiable 'agency action'" and the plaintiff could not "seek *wholesale* improvement of [the] program by court decree." *Id.* at 890–91. Rather, "[u]nder the terms of the APA," the plaintiff had to "direct its attack against some particular 'agency action' that causes it harm." *Id.* at 891.

---

[17] We do not mean to suggest that the total volume of timber sold in a given year is not ascertainable and measurable. It is. But its ascertainability does not make it a discrete agency action.

So too here. The Swanson plaintiffs' requested relief is targeted at the "continuing . . . operations of the BLM"—years' worth of policy choices and site-specific decisions—rather than "some particular 'agency action.'" *Id.* at 890–91. They complain not that the Secretary failed to take a *specific* action but rather that she failed to carry out the O & C Act's general directives. Their blunderbuss challenge to the BLM's program is better aimed at "the offices of the Department or the halls of Congress," not at the court. *Id.* at 891.

For the foregoing reasons, we reverse the district court's judgments in the Monument cases, the Plan cases and the Swanson case and remand for proceedings consistent with this opinion.

*So ordered*.